# Thomas Stapleton *v.* Citizens Traction Company, Appellant.

*Negligence—Master and servant—Unusual risk—Contributory negligence —Question for jury.*

A blacksmith's helper employed by an electric railway, if taken upon special duty to repair the lines, which is admittedly dangerous, has a right of action if injured in employment to which he was ordered without warning or direction as to its danger. The question of contributory negligence was properly for the jury.

Argued May 6, 1897. Appeal, No. 159, April T., 1897, by defendant, from judgment of C. P. No. 3, Allegheny Co., Nov. T., 1895, No. 538, on verdict for plaintiff. Before RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER, ORLADY and SMITH, JJ. Affirmed.

Trespass for personal injury. Before McCLUNG, J.

The facts sufficiently appear in the opinion of the court.

The defendant submitted the following points:

And now, to wit: January 11, 1897, counsel for defendant respectfully requests the court to charge the jury as follows:

1. Under all the evidence in this case, it does not appear

that the injuries complained of were caused by negligence for which the defendant company would be liable, and the verdict of the jury should be for defendant. *Answer:* Refused. [1]

2. The testimony on part of plaintiff, showing as it does, that he was employed to do certain work on the night of August 27, 1895, which was not the work of a blacksmith's helper, but certain work in connection with the lowering of the span and trolley wires of the defendant company, and that he was being paid for such work,—if the jury finds that he was injured while acting within the scope of the work which he agreed and was employed to do on the night in question, he cannot recover, and the verdict must be for the defendant. *Answer:* Refused. [2]

3. If on the other hand the jury finds that plaintiff when injured was engaged at work which he was employed to do, but which he voluntarily and of his own motion assumed and undertook to do without being directed by the foreman or man in charge of the work, plaintiff cannot recover, and the verdict must be for the defendant. *Answer:* Affirmed.

4. If the jury finds that plaintiff after going up the ladder to the top of the pole received a shock sufficient to cause him to drop the wrench which he had in his hand, which shock he knew to be an electric shock, and after receiving such shock he remained on the ladder and continued to work with the wires and the bolt at the top of the pole, he assumed the risks of the work in which he was then engaged; he cannot therefore recover and the verdict must be for the defendant. *Answer:* This is refused. Under the evidence in this case, I cannot say as matter of law that any shock sufficient to cause him to drop the wrench would make it contributory negligence for the plaintiff, however inexperienced, to continue at the work, if, as he says, Venning, the electrician, assured him that he was safe and directed him to go on with the work. As I have said, however, while I do not say as matter of law that this was contributory negligence, I leave the fact to you to determine as a question of fact. [3]

5. Under all the evidence plaintiff cannot recover, and the verdict must be for the defendant. *Answer:* Refused. [4]

Verdict for plaintiff for $800. Defendant appealed.

*Errors assigned* were (1–4) refusal of the plaintiff's first, second, fourth and fifth points, reciting same.

*W. W. Parker*, with him *Geo. C. Wilson* and *Wm. D. Evans*, for appellant.—The negligence is the gist of the action, but the absence of negligence contributing to the injury on the part of the plaintiff is equally important: Brown v. Railway Co., 58 Me. 384.

The mere fact of the relationship of master and servant does not impose upon the master a guaranty of the servant's safety: Sykes v. Packer, 99 Pa. 465; Railway Co. v. Sentmeyer, 92 Pa. 276.

When he undertakes hazardous duties, he assumes such risks as are incident to their discharge from causes open and obvious, the dangerous character of which he has an opportunity to ascertain: Wharton on Neg., sec. 214; Brossman v. Ry. Co., 113 Pa. 490; Beittenmiller v. Brewing Co., 22 W. N. C. 33; Diehl v. Lehigh Iron Co., 140 Pa. 487.

When the facts are admitted or so clearly and conclusively proved as to admit of no reasonable doubt, it is the duty of the court to declare the law applicable to them: R. R. Co. v. Werner, 89 Pa. 59; Wormell v. Maine Central R. Co., 10 Atl. Rep. 49; Leary v. Boston & Albany R. Co., 139 Mass. 580.

*Marron & McGirr*, for appellee.—The law of this case is well settled and is correctly stated by the trial judge: Dillon v. Light Co., 179 Pa. 482; Wagner v. Chemical Co., 147 Pa. 475.

When the superintendent assured him that he would not be hurt he had a right to rely on that assurance, and return to his work: Patterson v. Railroad Co., 76 Pa. 389.

It is the duty of an employer to fully instruct an inexperienced employee when he engages in work which is new to him: Bannon v. Lutz, 158 Pa. 166; Lebbering v. Struthers, 157 Pa. 312.

The foreman, having told him it was safe it was for the jury to pass on the question of contributory negligence: Johnston v. Ott Bros., 155 Pa. 17.

OPINION BY WICKHAM, J., July 23, 1897:

The plaintiff was a helper in the defendant company's blacksmith shop, his regular hours of labor being from seven o'clock

in the morning until five in the evening. Looking at all the evidence, it is quite clear that he was ignorant of many things, a knowledge whereof is necessary to the safety of any one working at or with heavily charged electric wires or appliances.

Shortly before midnight of August 27, 1895, he and several others were taken, by Mr. Venning the chief electrician of the Sharpsburg division of the defendant's railway, to a point where it was necessary to temporarily detach from the iron poles, some of the span wires supporting the trolley. The latter carried from five hundred to five hundred and fifty volts of electricity, enough, according to the evidence, to kill or seriously injure an ordinary man. Owing to defective insulation between the span wire and the trolley, both were charged, and while the plaintiff was working near the top of the pole some eighteen or twenty feet from the ground, he received a severe shock which caused him to fall from the ladder whereon he was standing and sustain physicial injuries of a more or less serious nature. His account of the cause and manner of his mishap cannot be better presented than by quoting the following extracts from his own testimony, viz: " Q. What then? A. We was ordered to put the ladders up, and when the ladder was up somebody, I forget his name, Joe Seifred I believe was his name, we were both standing there together, and the chief electrician he give me a wrench and he gave him a wrench and he told us we were to go and take down that wire. Joe Seifred went up on the pole and said he couldn't do nothing with it, and he come down and Mr. Venning told me to go up and see what I could do with it. Q. Venning was the chief electrician? A. Yes, sir. Q. Well, did you go up the ladder? A. I went up the ladder, and as I was going up the ladder, there was an iron rod sticking out at the top of the ladder and I run my wrist against it when I got to the top of the ladder; I put my hand around the pole and I run my wrist up against the top of the ladder and it knocked the wrench out of my hand; the electricity knocked the wrench out of it. Q. Did you know what it was at that time? A. No, I didn't know what happened. The men on the ground asked me did I get it, and I says 'I got something.' Q. What happened then? A. The men started to laugh at me and they picked up the wrench and handed it to me. Q. Who did that? A. The chief electrician and the assistant superintendent and

all the men that was on the ground.   Q. Well, who was it handed it to you?   A. The chief electrician gave it to Mr. Collins and asked him to hand it up to me.   Q. What did he tell you to do?   A. I told him that I had better come down, and he says, ' Go ahead Tom ' and I went ahead.   I thought a man that understood his business wouldn't tell me for to go where there was danger.   I went up and tried to turn the nut, and couldn't turn it; the bolt was turning with the nut, so I told him that I couldn't hold it; that I couldn't do any good that the bolt was turning with the nut.   He says, ' Take hold of it with your hand.'   I did so and I couldn't hold it, and I says ' I can't hold it with my hand.'   ' Well,' he says, ' Wait a minute and I will give you something to hold it with,' and he went over to the wagon and he brought me over a long pair of tongs or pliers, and he says, ' Stick them in the eye of the bolt and it will help you to hold it.'   I had the wrench on the nut and I stuck the pliers in the eye of the bolt and after I put the pliers in the eye of the bolt that's all I knew of.   I hung there awhile; well, I don't know anything after I done so.   Q. When did you first regain consciousness after this?   A. I couldn't tell you how long I was lying there.   Q. Well, you were lying on the ground when you came to, were you?   A. Yes, sir.   Q. How was that ladder constructed with regard to the top rung?   A. It was standing on the ground and standing up against the pole and a man on the bottom holding it.   Q. What was the top rung made of?   A. It was made out of wire.   Q. And it leaned against. the pole?   A. Yes, sir.   Q. Was it a half circle in shape?   A. A half circle in shape.   Q. It fitted around the pole?   A. Fitted around the pole.   Q. And what material was the pole?   A. Why, it was iron.   Q. What was this bolt that you were asked to unscrew?   A. It was an eyebolt made out of iron.   Q. It passed through the pole, did it?   A. Yes, sir, it passed through the top of the pole.   Q. And on what side was the nut?   A. As you go out, it is on your right hand side going out; it is on the opposite side to the wire.   Q. What is attached to this eyebolt? A. Why, there is a cross wire goes from the wire that runs the trolley.   Q. There are two poles, one on each side of the street? A. Yes, sir.   Q. And a span wire runs from one pole to the other?   A. From one pole to the other.   Q. And the trolley wire runs over that span wire?   A. Yes, sir.   Q. The span

wire is to hold the trolley wire up? A. Yes, sir. Q. Well, had you any knowledge of electricity or experience at all in that line before you went out there this night? A. No, sir, I never had any knowledge or experience, either. Q. Had you any knowledge of the operation of these electric railways? A. No, sir. Q. Did you receive any instruction from the defendant company or any of its superintendents or agents in regard to the danger of going up this pole? A. No, sir. Q. Or anything further about the work than what you have testified here? A. No, sir; I was told to go up, that there was no danger on it."

If the plaintiff's story were true, there was evidence enough of negligence on the part of the chief electrician, who had charge of the whole work and stood in the place of the company. It was, at the least, his duty to have instructed the plaintiff, regarding the danger attending the work he was sent up the pole to do. That leakage from the trolley to the span wire is, or at least was at the time, a common occurrence was fully proved at the trial. Moreover, it was shown that by a simple, well-known and commonly used device, easily and quickly made out of wire at any time or place and costing comparatively nothing, it could and should have been ascertained before any one went up the pole whether or not the span wire was charged. Mr. Venning admits in his testimony that he knew that the plaintiff's work was hazardous.

The court could not say, as a matter of law, that the plaintiff was guilty of contributory negligence, in renewing his attempt to unscrew the nut, after he was shocked the first time. It is probable that he knew that the shock was caused by electricity, but this does not necessarily convict him of contributory negligence. The first impulse of a servant who has confidence in his master, is to obey. Without any time for consideration, the plaintiff might not be blamable for assuming that his superior, presumably a skillful electrician, would not deceive him and insist on keeping him at an employment wherein there was any real and imminent peril. No better way could be adopted by Venning and the other experts below, to reassure the ignorant man above, than to treat his new and puzzling experience with jocularity. Thus are children laughed out of their foolish fears by their elders.

Every case must be governed by its own circumstances.

From the evidence we may conclude that an experienced man, or one properly instructed, could likely have got through without harm, by exercising considerable care, or if he felt that he could not, he probably would have had that presence of mind, which would have led him to instantly refuse to go further. The plaintiff, if we believe his story, was inexperienced and uninstructed. He had no time to reason or think. His superior's order was quick and imperative, as the work had to be done in the few hours of the night allotted to it. He should not have been sent to, or left in, a place known to the superior to be very dangerous, without at least having had some instruction and information as to the risk he was running. This is not a case where one voluntarily, or even in obedience to an order, foolishly remains for hours, days or weeks, at an employment which 'he knows or must be held to know, is extremely hazardous. It was for the jury under proper instructions to determine the question of the defendant's negligence and the plaintiff's contributory negligence.

Turning now to the defendant's theory of the facts, we find evidence ample, if believed, to prevent a recovery. Venning positively denied that he sent the plaintiff up the pole, or that he even knew the plaintiff was there until an instant before the latter fell, when he, Venning, returning from another pole and for the first time seeing the plaintiff in a place of danger, called to him in the way of warning. He says too that he handed the plaintiff no tools with which to work. He is corroborated in these statements, although it may be mentioned that Collins, a witness for the plaintiff, testifies that Venning was there directing the plaintiff what to do, and that he ordered this witness to hand up to the plaintiff the wrench, that had fallen, and a pair of pliers. Seifred, one of the defendant's witnesses, a lineman, said that he warned the plaintiff not to go up, told him the wire was charged, and briefly instructed him how to avoid the danger, if he would ascend the pole as he insisted on doing. This testimony of Seifred was however denied by the plaintiff, and it must be admitted that his denial was not without inherent probability, for there is something in the nature of man which impels him rather to avoid a danger that is made known to him, than to recklessly court it.

On the whole, the evidence was so conflicting that the court

could not do otherwise than submit it to the jury. This was done in a charge fair, clear, and adequate, nothing that required comment being left untouched. The jury, after seeing and hearing all the witnesses, accepted the plaintiff's theory of the facts. If they were wrong, in their conclusion, the matter cannot be righted here.

Judgment affirmed.